## AMOS DORN *v*. THE STATE.

DISTURBING RELIGIOUS WORSHIP. — The meeting-house of one denomination was, by its permission, alternately used on stated Sabbaths by two other denominations. On a Sabbath set apart for one of these two, the other occupied the house without protest or interference except by the appellant, who was sexton of the proprietary denomination, and who, in the midst of the services, disturbed the congregation by raising a quarrel about their right to occupy the house on that day. His defense is that the congregation were trespassers, and not " conducting themselves in a lawful manner," and were, therefore, not within the purview or protection of the statute. But *held*, that constitutes no defense, and the conviction is sustained.

APPEAL from the County Court of Lamar. Tried below before the Hon. S. C. BRYSON, County Judge.

The case is stated in the opinion.

*Charles A. Dailey*, for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

WHITE, J. Amos Dorn, this appellant, was tried upon an information brought under the act of April 23, 1873, amending article 284 of the Penal Code (Pasc. Dig., art. 1904), which reads thus :

"Any person who, by loud and vociferous talking or swearing, or by any other noise, willfully disturbs any congregation assembled for religious worship, and conducting themselves in a lawful manner, whatever may be the religion professed by such congregation, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than twenty-five nor more than one hundred dollars, and may be imprisoned in the county jail not exceeding thirty days, in the discretion of the jury." Acts Thirteenth Legislature, 43.

The result of the trial was the conviction of the defend-

ant, and his punishment assessed at a fine of $62.50, and imprisonment in the county jail for a period of five days.

It appears that defendant was sexton of the African Congregational church in the city of Paris, Lamar County, Texas, and, as such officer, was authorized to take charge of the church property belonging to that body.

Actuated by that rare spirit of charity and love so beautiful amongst brethren who dwell together in unity, these Christian people were wont to share their church edifice with their Methodist and Baptist neighbors, who had no house of worship of their own; and it was so arranged that on fixed and stated occasions these other denominations used and enjoyed the building as though it belonged to themselves. On Sunday, December 16, 1877, the Baptist denomination were holding services in the church, the minister being in the midst of his sermon, and the congregation paying strict and devout attention, when the defendant, according to the testimony of most of the witnesses, walked down the aisle to near the pulpit, with his hat upon his head and a cigar in his mouth, and, speaking to one of the congregation, they two went out of the house together. Soon thereafter loud and angry talking was heard at the door; and one witness says " he looked out of the window and saw defendant with his hand uplifted as though he would strike, and heard some one say, 'I will knock a negro down,' and another replied he would kill a negro." The whole congregation, males and females, were disturbed and annoyed. The preacher had twice to stop in the midst of his discourse, because he could not command the attention of his hearers. And one of the ministers, who was sitting in the pulpit, actually had to get up and go out to see what the disturbance was, and who was creating it.

Now, the cause of the difficulty, as explained by defendant's witness, was that defendant, as sexton of the Congregational church, demanded to know of Jack Tunsel, who

was an officer of the Baptist church, why the Baptists were preaching there on that occasion, without authority, when the Methodists alone had been authorized to worship there on that day. Both parties became excited, and hot words soon passed between these zealous officials of the two respective churches. Tunsel told the defendant that "if he didn't leave, he would lock him up in a minute;" and defendant promptly responded, "You had better try it." How a personal conflict, to all appearances so imminent, was avoided, and under the influences of what better counsels the disturbance was finally quelled, and defendant induced to depart, we are left to conjecture, since it is not disclosed by the evidence adduced. Suffice it to say, a personal collision and bloodshed was not added to the otherwise disgraceful conduct of the defendant on that Sabbath morning.

· It is now urgently insisted here, in behalf of defendant, that the judgment rendered against him should be reversed because the court ruled out certain testimony which, if it had been admitted, would have shown that the Baptists had no right of occupancy of the church that day; that, being without authority, they were trespassers; that, being trespassers, they were conducting *themselves* in an unlawful manner; and that, if they were conducting themselves in an unlawful manner, it was no violation of law for him, or any other citizen, to disturb them in their worship. In other words, he attempts to justify his conduct because they had no authority from him to use the house.

For aught that appears (a fact that seems not to have suggested itself to him), the Methodists, who had control of the house on that day, by admitted authority of this sexton, might have given way to their Baptist brethren, and the occupancy of the latter could reasonably and naturally have been accounted for in that way. At all events, the Methodists were not disputing their right, nor have they been heard to complain throughout the transaction. Even

if defendant's theory be true, that the Baptist congregation were trespassers, they were evidently trespassers upon the rights of their neighbors, the Methodists, and not upon his, on that occasion. Had defendant been permitted to introduce the testimony the rejection of which is the ground of his complaint, we cannot believe it would have changed the general result in the case, and certainly it could not have justified his conduct in the premises.

The charge of the court presented no such errors as were calculated to injure the rights of the defendant, nor do we perceive any other material error committed on the conduct of the trial.

In all seriousness, we are of opinion the punishment assessed against defendant was justly merited by his conduct, and it is to be hoped that when he pays his fine of $62.50, and spends five days of quiet reflection within the walls of his county jail, he will be brought to a sense of the enormity of his conduct, have better conceptions of Christian duty and charity, and a higher appreciation of the wisdom and justice of the law in securing religious worship against worldly and intrusive disturbances, whether created by ungodly laymen or saintly churchmen.

The judgment of the lower court is affirmed.

*Affirmed.*